EMILIO HORMAZABAL, Plaintiff and Appellee, *v.* SECRETARY OF THE TREASURY, Defendant and Appellant.

No. 11278. Argued March 5, 1956.—Decided April 30, 1956.

*José Trías Monge, Attorney General,* and *José A. García Malpica, Assistant Attorney General,* for appellant. *Félix Ochoteco, Jr.* for appellee.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

The Treasurer of Puerto Rico, now Secretary of the Treasury, notified Emilio Hormazabal of an income-tax

deficiency of $37,080.03 for the year 1948. This deficiency was based on the fact that the taxpayer had received from unidentified sources a taxable income of $60,000, in addition to the income declared on the return for that year. The Treasurer reached this tax determination after making an investigation, which showed that on May 3, 1948, Hormazabal lent the sum of $60,000, in cash, to Miguel Bidot, which sum, according to an analysis of the taxpayer's capital increase from 1932 to 1948, was not in the hands of Hormazabal.

Feeling aggrieved by this tax determination, Hormazabal appealed to the Superior Court alleging that such $60,000 represented net income legally received by him in years previous to 1949, and not unidentified funds corresponding to 1948 or to any other previous year.

After a hearing on the merits, the lower court rendered judgment setting aside the determination of the Secretary of the Treasury. On appeal, the latter maintains that the lower court erred (1) in admitting in evidence plaintiff's Exhibit X and relying on that evidence to grant the petition, and (2) in granting the petition, inasmuch as the findings of fact and the conclusions of law on which the judgment is based are not supported by the evidence.

The first error was committed. Appellee's theory is that of the $60,000 which he lent in cash to Bidot in 1948, and which according to the determination of the Secretary of the Treasury was unidentified taxable income, $41,358.75 represented the proceeds of the liquidation of United States Government Bonds through the National City Bank of New York. Plaintiff's Exhibit X, which was admitted in evidence by the lower court over defendant's objection, is a letter dated December 18, 1952, addressed by the National City Bank of

New York to Emilio Hormazabal.[1]   In that letter the bank confirmed that on February 2, 1948, it had liquidated the sum of $41,358.75, which represented the proceeds of the Certificates of Indebtedness of the United States Treasury.   The trial court gave probative force to this letter and rested its judgment, in part, on its content.[2]   The letter tended to prove (1) that plaintiff was the holder of Certificates of Indebtedness of the United States Treasury, (2) that those certificates were liquidated by the National City Bank of New York, and (3) that the proceeds of the liquidation netted the sum of $41,358.75.   The latter fact is a controlling factor in the case, inasmuch as the proceeds from the liquidation of the Certificates of Indebtedness represent a substantial portion of the taxpayer's income which the Secretary of the Treasury considered as unidentified.

The letter was inadmissible in evidence.   The facts set forth therein coud not be disputed by the defendant through cross-examination of the bank officer who signed it.   It was hearsay evidence.   Section 26, *Law of Evidence;* V Wig-

---

[1] Exhibit X reads verbatim as follows:

New York 13, N. Y.
December 18, 1952

Via Air Mail
Mr. Emilio Hormazabal
c/o Francisco Olazabal
Bayamón, Puerto Rico
Dear Mr. Hormazabal:

We hereby confirm that the following securities were liquidated by you through us:

On February 2, 1948, $41,358.75 representing proceeds of U. S. Treasury ⅞% Certificates of Indebtedness.

Very truly yours,
The National City Bank of New York
p. p. (Sgd.) A. G. Natvig
A. G. Natvig.

[2] The lower court made the following finding of fact:

"On February 2, 1948, he liquidated in the National City Bank of New York, in that city, certain United States Treasury Bonds held by him, from which he received the sum of $41,358.75, and in the month of May of that year he lent to Miguel Bidot the sum of $60,000, which the latter secured by a mortgage."

more, *Evidence*, §§ 1362, 1363, 1364, and 1367, p. 3 *et seq.* However, the appellee contends that when the document in question was admitted in evidence there was already independent evidence in the case on the facts contained therein. This assertion is not altogether correct. In a written interrogatory, which was answered by plaintiff and admitted as the evidence of both parties, it is stated:

"1—(*a*) Plaintiff received the sum of $60,000 from salaries, profits of partnerships, interest on mortgage investments, *and liquidation of United States Bonds.*" (Italics ours.)

On the other hand, witness Francisco Olazabal, called by plaintiff, testified in connection with these bonds that he knew that Hormazabal owned bonds, although he did not know when he acquired them and that those bonds were cashed to take Bidot's mortgage, all of which he knows for a fact because Hormazabal wanted to take the money he had to Spain and the witness advised him not to; that Hormazabal then decided to bring it to Puerto Rico and invested it here. This is the entire evidence, apart from Exhibit X, which is in the record in connection with the bonds. This evidence establishes at the most that appellee Hormazabal had invested money in United States Government Bonds; that he cashed those bonds and invested the proceeds in the mortgage of Bidot. However, Exhibit X of plaintiff proved an additional fact which, as stated above, was essential for the decision of the case. This fact is the amount of money received by Hormazabal from the liquidation of the bonds. The said Exhibit X is the only evidence in the record bearing on the amount of the said sum. It would not therefore be correct to say that the admission of that evidence adds nothing to that already admitted, and, consequently, that the error committed was not prejudicial. *Cf. Zayas* v. *Land Authority*, 73 P.R.R. 837; *Ins. Ind. & Agr'al. Exp. Ass'n* v. *Cintrón*, 52 P.R.R. 611; *People* v. *Compañía Insular de Transporte, Inc.*, 46 P.R.R. 576; *Waterman & Co., Inc.* v. *Méndez Hnos. & Co.*, 44 P.R.R. 339;

*People* v. *Rodríguez*, 41 P.R.R. 391; *Webb* v. *Porto Rican American Tobacco Co.*, 16 P.R.R. 378.

■■ By the second assignment of error appellant challenges the findings of fact and the conclusions of law of the lower court, alleging that they are not supported by the evidence. The gist of his contention is that the taxpayer did not overcome the presumption of correctness in favor of the tax determination, for which reason, in line with the case of *Buscaglia, Treas.* v. *Tax Court*, 70 P.R.R. 384, the complaint should have been dismissed.

Appellant discusses this error assuming, without admitting, that plaintiff's Exhibit X was admissible in evidence. The Treasurer, we have said, reached this tax determination by using the net worth method during a number of years.[3]

According to the figures admitted by both parties, Hormazabal invested in 1941 the sum of $40,000 in Certificates of Indebtedness of the United States Treasury.[4] On redemp-

---

[3] See *Goe* v. *C.I.R.*, 198 F. 2d 851, *cert. denied*, 344 U. S. 897; *Davena* v. *United States*, 198 F. 2d 230, *cert. denied*, 344 U. S. 878; *Gariepy* v. *United States*, 189 F. 2d 459; *Dawley* v. *United States*, 186 F. 2d 978; *Bell* v. *United States*, 185 F. 2d 302, *cert. denied*, 340 U. S, 930; *Pollock* v. *United States*, 202 F. 2d 281, *cert. denied*, 345 U. S. 993; *Holland* v. *United States*, 348 U. S. 121; *Friedberg* v. *United States*, 348 U. S. 142; *United States* v. *Calderón*, 348 U. S. 160; *Smith* v. *United States*, 348 U. S. 147; Blackburn, *Arbitrary Methods of Income Determination; Taxes, The Tax Magazine*, Nov. 1952, p. 905. See also in *Taxes* review, *op cit.*, 1953 February issue, p. 112, the article *Recent Civil Fraud Cases—Problems of Burden of Proof*, subtitle *Indirect Proof of Income, Bank Deposit Method;* Mills, *The Net Worth Approach in Determining Income*, 41 Va. L. Rev. 927.

[4] Appellant states in his brief, footnote 14:

"Although plaintiff did not establish by the evidence the time when those Certificates of Indebtedness of the Federal Treasury were acquired by Hormazabal, nor the amount of money paid for them, it may be reasonably inferred that they were acquired on April 11, 1941, for the sum of $40,000. Let us see. If on February 2, 1948, Hormazabal receized the sum of $41,358.75 from the liquidation of his Certificates of Indebtedness of the Federal Treasury, and according to plaintiff's answer to defendant's interrogatory the plaintiff received in 1948 the sum of $1,358.75 in interest on the so-called United States Bonds, the conclusion is that the said sum of $1,358.75

tion in 1948, he received the principal plus, $1,358.75 in interest. In 1946 he had received additional interest on those securities amounting to $656.25. By 1948 he had received in all the sum of $42,015 for the aforesaid items. In December 1943 he received the sum of $43,137.42 from the liquidation of his share in the partnership F. Olazabal & Cía., S. en C.[5] In 1945 he received $8,000 in payment of a condominium in a lot. He also received income during the years 1945, 1946, 1947, and 1948, consisting of interest on other obligations, aggregating $3,600. The taxpayer therefore received a total income of $97,752.42 from 1943, when he retired from business, to 1948.

Regarding his expenditures during the same period, there is no controversy on the following items: $20,000 of a loan made by Hormazabal to Francisco Olazabal on June 22, 1945; $60,000 lent to Miguel Bidot on May 3, 1948; and $5,616.81 paid as income tax in the period from 1943 to 1948 inclusive. This makes a total expenditure of $85,615.85 without including, of course, the taxpayer's personal expenses. By a simple arithmetical operation, subtracting the liabilities from the assets, a balance of $12,136.61 is left to cover the taxpayer's personal expenses.

However, the Secretary of the Treasury included in the liabilities other items which, if they are correct, would show

represents interest and the other $40,000 return of capital. However, if Hormazabal also received on account of interest on the alleged bonds, according to the information supplied by him in the answer to defendant's interrogatory, the sum of $656.25 for the year 1946, he then received *in toto* $2,015 in interest on the bonds. Since the bonds earned interest at ⅞ per cent per annum on the principal of $40,000, in order for those bonds to earn interest aggregating $2,015 it was necessary to have possessed them for a period of 5 years and 297 days, that is, that they should have been acquired around April 11, 1942. (In order to enable this Court to check these estimates, attention is called to the fact that $40,000 at ⅞ per cent per annum yields $350 in interest per year.)"

[5] Exhibit 1 of plaintiff (deed No. 60 of December 2, 1943, executed before Notary Gaspar Rivera Cestero).

that the $60,000 lent by the appellee to Bidot is unidentified income. One of these items is the sum of $19,419.82 which the taxpayer delivered to Olazabal on October 26, 1947. This delivery is evidenced by a letter written in Madrid on January 20, 1951, by Luis Collado to his attorney in fact in Puerto Rico, Francisco Olazabal. The letter in its pertinent part reads: "Regarding the desired information, fortunately I can give it to you now in full, since I have here with me all the records. According to my records, your account is debited as follows and it shows the following items . . . ; and on October 28, 1947, Emilio Hormazabal also delivered to you $19,419.82, in payment of another transfer which I made to him at this end and which he liquidated for that amount. I assure you that the information regarding these remittances is accurate and I hope it agrees with your records . . ." Appellant contends that "he considered this sum of $19,419.82 as an expense or disbursement of Hormazabal, inasmuch as he was unable to determine from the investigation on what account Hormazabal owed that sum to Collado." However, it appears from that letter that Collado made a transfer of $19,419.82 to Hormazabal in Madrid, and that the latter paid him back by delivering a like sum to Olazabal on October 28, 1947. There is no basis, therefore, to consider that by such payment the taxpayer made an investment of $19,419.82 which reduced by a like sum his available assets.

The Secretary of the Treasury also included as a liability the sum of $18,000 which he considered, on the basis of an estimate, to be the taxpayer's personal expenses during the period from October 31, 1943, to May 3, 1948, namely, at the rate of $4,000 annually for a period of 4½ years.

In the analysis of the taxpayer's capital during the said period (1943–1948), we pointed out that the income exceeded the expenses by $12,136.61, without including in that analysis

the taxpayer's personal expenses. These expenses were estimated by the Secretary of the Treasury at $18,000, that is, at the rate of $4,000 annually. This estimate was based principally on the fact that after 1943 the taxpayer traveled continuously. However, in view of other facts disclosed by the evidence we agree with the appellee that the sum of $12,136.61 would be reasonable to cover the personal expenses. The estimates made by the Secretary of the Treasury are not based on data or on specific figures.[6] Hormazabal was single and lived with a family. He had no obligations other than his own; he was extremely thrifty and lived modestly. From 1934 to 1943, he had withdrawn from the partnership F. Olazabal & Cía., S. en C., for personal expenses, the total sum of $17,201.33, that is, an average of less than $2,000 annually. In computing his traveling expenses we must not overlook the fact that Hormazabal incurred no expenses in Puerto Rico. It would not therefore be unreasonable to estimate such personal expenses at approximately $3,000 per year. Hence, it seems to us that the estimate of those expenses made by the inspector of the Bureau of Income Taxes is rather high.

The Secretary of the Treasury also included as an expense the sum of $40,000, invested by the taxpayer in Certificates of Indebtedness of the United States Treasury. His reasoning is that, although it is true that Hormazabal received in 1948 an income of $41,358.75 from the redemption of those securities, it is no less true that it was necessary for him to make an investment of $40,000 in order to acquire them. The fallacy of this argument lies in the fact that,

---

[6] The only showing from the record in connection with the sum of $18,000 is the testimony of inspector Fernando Fernández, who testified:

"Q—How did you obtain that information? How did you arrive at the sum of $18,000?

"A—I went to the Emigration Bureau. He left in 1944. He returned in 1946, and there is another datum, that he left in 1948 and has not returned. He travels continuously to Spain and to the United States. I estimated that $4,000 was a reasonable amount a year per person."

according to an analysis of the taxpayer's income since 1943, his income amounts to $97,752.42. We cannot deduct from this figure the $40,000 invested in the Certificates of Indebtedness since, as alleged by appellant himself, the taxpayer made this investment prior to 1943, namely, in 1941.

In view of the foregoing, we conclude that if Exhibit X of appellee had been admissible in evidence, that is, if it had been proved that plaintiff received in 1948 the sum of $41,358.75 as proceeds from the Certificates of Indebtedness of the United States Treasury, he would have identified the income which appellant considered as unidentified and which gave rise to the deficiency involved in this case.

Although the second error was not committed, the first error entails the reversal of the judgment rendered. We believe, however, that in furtherance of justice the appellee should be given an opportunity to present competent and admissible evidence on the fact contained in Exhibit X.[7] Cf. Cruz v. Heirs of González, 72 P.R.R. 291; Sánchez v. District Court, 69 P.R.R. 457.

Consequently, the judgment will be reversed and the case remanded to the lower court for a new trial for the sole purpose of hearing the evidence which the parties may deem convenient to present on the fact contained in plaintiff's Exhibit X, with directions to render judgment not inconsistent with the terms of this opinion.

---

[7] It is likely that if the lower court had denied the admission of that document, plaintiff would have attempted to prove the same fact by other evidence.